Curran, Dennis J., J.
Factual Background
On January 2, 2012, Mr. Thomas Miller, a 62-year-old retiree, went to his local YMCA to work out. Mr. Miller was a member of the “SilverSneakers” program, designed to promote YMCA membership among older people. He checked in at the front desk at about 5:55 a.m., and at some point, went to use the steam room. The front desk employee observed that at the time he came in, he appeared unwell and “pale.”
At about 7 a.m., another YMCA member discovered Mr. Miller lying unconscious on the floor of the steam *563 room, with hot steam blasting upon his body. An emergency call button outside the steam room was activated which alerted the front desk staff person. A call was placed to 911, but in the meantime, two YMCA employees tried to gain access to the locked steam control room to shut off the steam vent. They were unable to do so because the only way to access that room was by a master access key, which only certain YMCA employees had, none of whom was immediately available.[1] The YMCA disputes this, claiming instead that one of its employees did obtain a key, and was able to unlock the steam control door and shut off the steam vent. Another employee tried to use a defibrillator on Mr. Miller, which did not work because of the moisture on Mr. Miller’s body and the unavailability of extra pads.
Mr. Miller was taken by ambulance to the hospital where he was diagnosed with second-degree burns covering 12-15% of his body, including his face. He underwent multiple surgeries, but died about three weeks later. This lawsuit alleges a violation of the wrongful death statute on behalf of Mr. Miller’s beneficiaries (count I), conscious pain and suffering (count II), and gross negligence (count III). Specifically, count I and II allege negligence and count III, gross negligence. YMCA Memorandum at page 3.
On the issue of liability, the YMCA states that at the time of this tragic incident, a “Danger sign was posted outside the steam room which cautioned people, among other things: ”Do not use alone . . ." There is disputed evidence regarding access to the control room to enable a staff person to shut off the steam room valve. The only YMCA employee authorized to enter the control room was Kenneth McArthur, who was in his basement office at the time the alarm was sounded. Although Patrick Carmody had a key to that room, he was not permitted to use it, while Mr. Miller lay on the floor with water scalding his limp body. Even the responding EMTs could not gain access to the steam control room. It was another five minutes while Mr. McArthur watched efforts by others to attend to Mr. Miller before he finally shut off the steam control valve.
The YMCA concedes that it never considered placing an emergency alarm inside the steam room (although there was one directly outside it), and further, admits that if a person became incapacitated inside the room, that individual could not set off the alarm.
Mr. Miller’s estate seeks to make much of the facts that the YMCA officials at the facility had: 1.) no steam room safety policy; 2.) no “walk through locker room logs”; 3.) no regular staff inspections of the steam room; 4.) no risk management classes for its employees; 5.) no discussion of members’ health risks in using the steam room; 6.) no discussions about “having any doctors or other medical professionals present or on-call” if an older member’s health became emergent; 7.) no official member clearance was required of Silver Sneaker members; and 8.) no written logs of inspections of the steam room. Perhaps more importantly, the estate claims that when EMT personnel responded to the scene, they still could not gain access to the control room to shut off the valve in the steam room where Mr. Miller’s body still lay, with his flesh burning, unconscious on the floor.
All of the defendants—the YMCA and its two officers, President Kathryn Hunter and Vice President Ken Mierzykowski—have filed motions for summary judgment, contending that no genuine issue of material fact exists. Additionally, the YMCA has moved separately for summary judgment because it says that Mr. Miller signed a waiver that, it contends, absolves it of any liability.
THE APPLICABLE LEGAL STANDARD
The Court will grant summary judgment only when there are no genuine issues of material fact. See Mass.R.Civ.P. 56(c). The burden is on the moving parly to demonstrate the absence of a triable issue and that it is entitled to judgment as a matter of law. Id.; Madsen v. Erwin, 395 Mass. 715, 719 (1985). Where the burden of proof at trial rests with the non-moving party, the moving party may satisfy its summary judgment burden by either presenting “affirmative evidence negating an essential element” of the non-moving party’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991).
“Where a moving party properly asserts that there is no genuine issue of material fact, ‘the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.’ ” Id., quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). All of the evidence must be viewed in the light most favorable to the non-moving parly. Foster v. Group Health, Inc., 444 Mass. 668, 672 (2005). If the opposing party establishes relevant and material issues of fact for trial, summary judgment must be denied. Mass.R.Civ.P. 56.
DISCUSSION
There can be little question that one who pays for admission to a facility or a patron of a commercial establishment has a right to expect to be reasonably safe while on its premises. Upham v. Chateau de Ville Dinner Theater, Inc. 380 Mass. 350 (1980); Kane v. Fields Corner Grille, Inc., 341 Mass. 640 (1961); see also Mounsey v. Ellard, 363 Mass. 693, 707 (1973).
The question of negligence is one of fact for the jury. Only when no rational view of the evidence warrants a finding that the defendant was negligent may the issue be taken away from them. Mullins v. Pine Manor College, 389 Mass. 45, 56 (1982).
The eight factual issues raised by Mr. Miller’s estate detailed above, as well as the fact that the YMCA had *564 no working defibrillator (AED) on its premises in violation of G.L.c. 93, section 78A, that the defibrillator had only one set of pads (instead of the usual two), and that the YMCA’s Medical Advisory Committee published safety recommendations entitled “Safeguarding Health and Well-Being,” subtitled ‘The Use of Saunas, Steam Room and Whirlpool/Hot Tubs in YMCAs”[2] which recommended that steam rooms have easily-accessible emergency shut-off systems all present genuine issues of material fact in this case.
Turning to the issue of waiver, Mr. Miller signed a release absolving the “Silver Sneakers” program of all negligence liability. However, the release nowhere mentions the YMCA or its employees. Even assuming—which this court does not—that the release is ambiguous, any doubt must be resolved in favor of Mr. Miller’s estate. Cornier v. Cont. Mass. Chapter of the National Safety Council 416 Mass. 286, 288 (2003).
It is revealing that the YMCA presently relies upon a waiver (here, entitled a “Physical Activity Waiver”)[3] that Mr. Miller signed to absolve itself of any negligence liability. But that begs the question: from what duly of care was the YMCA seeking to avoid responsibility. The very existence of the waiver concedes that the YMCA was aware of its duty to provide a safe environment for its members. Why else would the YMCA now argue that the waiver shielded it. The waiver offers no support for the YMCA’s effort because the very words of that document,[4] which, by its terms, applied to the “SilverSneakers Program,” stated:
I hereby release, waive discharge and covenant not to sue . . . from any and all demands, liabilities, losses and demands (including death), caused . . . by the negligence of any of the foregoing people or entities.
(Emphasis added.) Fatally, nowhere in this document is the YMCA mentioned.
Moreover, the waiver neither applies to count I (i.e., where the decedent could have released his own claims, but not those of his beneficiaries) nor to count III, which alleges gross negligence. Zavaras v. Capeway Rovers Motorcycle Club, Inc., 44 Mass.App.Ct. 17, 19 (1997).
Turning to the issues of negligence of the President Hunter and her Vice President and Director of Operations Mierzykowski, the latter acknowledges that he was responsible for the day-to-day training and supervision of employees in steam room safety, and developing any safety protocol for the steam room at this Westborough branch. He concedes he was ultimately responsible for safely at all four branches he supervised. He testified at deposition that he was unaware that the EMT team was unable to shut off the steam when they arrived because they had no access to the key to unlock the emergency shut-off switch.
YMCA President Hunter testified that she was the strategic leader of the facilily whose duties included personally supervising staff responsible for safely programs. She further stated under oath that she never participated in the drafting of any safety plan, although she had the final authority to approve or disapprove of major policy changes.
ORDERS
For these reasons, the defendant YMCA’s motion for summary judgment (paper no. 17), the defendants’ motion for summary judgment based on the Decedent’s Execution of a Waiver (paper no. 21), the defendant Boroughs Family Branch YMCA’s supplemental motion for summary judgment (paper no. 14), as well as those of the defendant Kathryn Hunter (paper no. 15) and Ken Mierzykowski (paper no. 16) must all be DENIED.

 Discovery has, however, revealed that the front desk employee had such a key, but for reasons that remain unclear, was not permitted to use it during this emergency.

 This document, submitted as Exhibit “C” in the summary judgment papers, is listed as having been “Revised” [in] “February 2012." Since Mr. Miller’s accident occurred on January 2, 2012, the proffered Resource Guide, released after his death, could not have applied to Mr. Miller’s situation. Nevertheless, the last page of this Guide shows that there were six iterations of this Guide in the previous 20 years: in May 1993, November 1997, October 1998, April 2000, April 2004 and November 2008. The Court has no idea which, if any, of these previous editions contained recommendations that would have applied to the horrible incident involving Mr. Miller’s as of January 2, 2012.

 See Exhibit 23 to the Supplemental Index of Exhibits in Support of Defendants’ Motions for Summary Judgment.

 Although they likely intended to shield the YMCA from liability, the waiver itself erroneously does not name the YMCA, but instead, the “SilverSneakers” program.